UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Robert Alexander,                                                  Civil No. 04-1323 (PAM/RLE)

                         Plaintiff,

v.                                                                 **MEMORANDUM AND ORDER**

Chuck Bond and
COKeM International, Ltd.

                         Defendants.

---

This matter is before the Court on Defendants' Motion for Summary Judgment. For the reasons that follow, the Motion is denied.

## BACKGROUND

**A.  The Parties**

Defendant COKeM International, Ltd. ("COKeM") is a video game and home entertainment software marketing and distribution firm based in Minnesota. Defendant Chuck Bond is its president. Plaintiff Robert Alexander, a Nevada citizen, is an entrepreneur who has a significant history in the video game business. This action arises out of an alleged contract between the parties.

**B.  The Agreements**

In December 1999, Alexander and Bond met for the first time. They continued to meet throughout 2000, in which they discussed a possible business relationship. Bond was interested in using Alexander's extensive experience to help develop and expand COKeM's video game business. Bond told Alexander that he would receive commission compensation

for his services. Alexander told Bond that he was interested in building a business in which he had fifty percent ownership. Alexander contends that he met with Bond in Las Vegas in May 2000 and that the two agreed that Bond would prepare a business proposal for their next meeting. Bond has no recollection of this meeting or the substance of their purported conversations.

Alexander claims that he and Bond had a series of meetings on July 22 and 23, 2000, at Bond's home and COKeM's former offices in Minnesota. Alexander claims that they talked about money, the business plan, space availability, retail opportunities, and the working details of their relationship. Alexander contends that these negotiations resulted in three definite agreements, the first two with COKeM and the third with Bond.

> One was, again, that if anything happened between both of us, that I could buy the inventory and the receivables at any time and that I could take the video game business elsewhere. Two, that based on my sales for the company, COKeM, any sales I brought, whether it was PC or video game related, I would receive 35 percent of the gross profit. And, third, that at some point I could acquire up to 40 percent of the stock of COKeM International Limited from Charles at an appraised value price after I started working at the company.

(Layden Decl. Ex. 2 at 62 (Alexander Dep.).) Alexander claims that both he and Bond expressly agreed to these terms. (Id. at 64-65.) No one else was present at the time of these agreements, and neither Bond nor Alexander have anything in writing that memorializes these agreements. Alexander contends that Bond assured him that he would document these oral agreements. (Id. at 66.) Alexander further claims that he and Bond extensively discussed the details of these agreements, eliminating any ambiguity. (See id. at 63-70.) Bond disputes that he and Alexander met at all in July 2000, and even if they did, Bond denies that he entered into

2

any oral agreements with Alexander.[1]

**C.     The Business Relationship**

The July 2000 agreements were not memorialized in writing. Nevertheless, Alexander began providing services on behalf of COKeM in October 2000. Alexander asserts that in order to build COKeM's video game business, he had to decline other business ventures, including the opportunity to form his own company. (See id. at 89-90.) Alexander was paid commissions on the sales he made. (Lien Aff. Ex. 54.) After Alexander joined COKeM, COKeM's sales went from $15 million in 2000, to $75 million in 2001, and to $125 million in 2002. (Layden Decl. at Exs. 12-15.)

Alexander claims that Bond continuously refused to memorialize the terms of the July 2000 agreements. He further claims that Bond tried to renegotiate the terms of these agreements. Throughout 2001, documents and e-mails were exchanged between Alexander and Bond. Both parties dispute the objective meaning, intent, and purpose of such documents. Bond insists that they were still negotiating the terms of their business relationship, because such documents referred to reaching an "agreement," while Alexander contends that they were merely trying to memorialize in writing the terms of the July 2000 agreements. Alexander maintains that he never modified, rescinded, or otherwise canceled the July 2000 agreements, and continued to conduct business accordingly.

---

[1] For purposes of this Motion, Bond analyzes Alexander's claims as Alexander portrays the facts. However, and the Court expressly notes, that Bond may dispute at trial whether these negotiations ever took place.

In October 2001, the parties began to discuss new contract terms. On or about October 5, 2001, Alexander received two proposals from Bond that were materially different from the purported July 2000 agreements. Alexander rejected both proposals. Alexander's main dispute was whether he would have the opportunity to buy equity, what percentage he would be entitled to own, and other terms regarding the equity purchase.

In November 2001, Bond's lawyer prepared another proposal, which Alexander again rejected. (Lien Aff. Ex. 24.) On December 1, 2001, Bond's lawyer drafted an Independent Contractor Agreement between COKeM and Alexander, which Alexander rejected. Alexander claims that he rejected all of these proposals because they were materially different from the July 2000 agreements. Although these proposals were offered as new agreements, Alexander maintains that until such new agreements were reached, the parties operated under the terms of the original July 2000 agreements.

Discussions allegedly continued into 2002. More e-mails were exchanged that evidenced a deteriorating relationship between Alexander and Bond. Bond claims that these e-mails support Defendants' position that the July 2000 negotiations did not result in any agreement, whereas Alexander again insists that these e-mails evidence his frustration with Bond's refusal to honor and memorialize the original July 2000 agreements.

From April through June 2002, discussions continued between Alexander and Bond and their respective attorneys. At one point, Alexander agreed to purchase the video game inventories and receivables from COKeM, but this never occurred. On June 28, 2002, the business relationship between Alexander and Bond formally ceased. Throughout his tenure,

Alexander received nearly $3 million in commission payments.

The Amended Complaint asserts that Bond and COKeM breached their obligations under the July 2000 agreements, in that they failed to pay him proper commission, refused to permit him to purchase equity in COKeM, and refused to sell the video game business. It also charges Defendants with fraud. Defendants set forth three arguments in support of their Motion: (1) the alleged oral agreements from July 2000 are not enforceable; (2) no breach of contract claim lies for unpaid commission because Alexander was at-will employee; and (3) Alexander fails to prove the essential elements of fraud. Alexander insists that there are sufficient disputes of material facts to withstand the Motion.

**DISCUSSION**

A.  **Standard of Review**

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the evidence in a light most favorable to the non-moving party. The burden of demonstrating that there are no genuine issues of material fact rests on the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

B.  **Enforceability of the July 2000 Agreements**

  1.  Meeting of the Minds

Defendants first contend that there was never a meeting of the minds concerning the

essential elements of the July 2000 agreements. "A contract requires a meeting of the minds concerning its essential elements." Minneapolis Cablesystems v. City of Minneapolis, 299 N.W.2d 121, 122 (Minn. 1980) (citation omitted). "If an alleged contract is so uncertain as to any of its essential terms that it cannot be carried into effect without new and additional stipulations between the parties, it is not a valid agreement." Druar v. Ellerbe & Co., 24 N.W.2d 820, 826 (Minn. 1946). Defendants maintain that the subsequent letters, e-mails and draft sheets that were exchanged between 2000 and 2002 clearly demonstrate that the purported July 2000 agreements were merely agreements to agree, and that the essential terms had not been negotiated to finality.

Alexander claims that Defendants mischaracterize the nature and meaning of the subsequent documentation. Alexander testified that he never rescinded or otherwise canceled the July 2000 agreements, and that all subsequent discussions contemplated agreements that would otherwise replace the July 2000 agreements. Alexander's testimony specifically states that he and Bond expressly agreed to these terms and that these terms would govern their relationship. Moreover, once Alexander began providing services for COKeM, Alexander received commissions from COKeM in accord with the July 2000 agreements. Indeed, COKeM would not have paid Alexander such commissions absent an agreement. Accordingly, Alexander has established that a genuine issue of fact remains on whether there was a meeting of the minds.

    2.    <u>Vagueness</u>

Defendants also argue that the July 2000 agreements fail as vague or indefinite. In

order for a valid contract to exist, the parties must agree "with reasonable certainty about the same thing and on the same terms." Peters v. Mut. Benefit Life Ins. Co., 420 N.W.2d 908, 914 (Minn. Ct. App. 1998). A contract that "is so vague, indefinite, and uncertain as to place the meaning and intent of the parties in the realm of speculation is void and unenforceable." King v. Dalton Motors, Inc., 109 N.W.2d 51, 52 (Minn. 1961). If substantial and necessary terms are left open for future negotiation, the purported contract is void. See id. However, "the law does not favor the destruction of contracts because of indefiniteness." Id.

The three items allegedly agreed to in July 2000 concern Alexander's commission payment, his ability to purchase the video game business, and his equity options. Defendants contend that the agreement regarding commission payments is indefinite, because it fails to define the time period for which Alexander was entitled to such commissions, whether such commissions were based on sales made solely by him or rather by all of COKeM sales, and any other compensation terms to which Alexander was entitled. They contend that the video game purchase agreement is indefinite because it is unclear whether the purchase was solely inventory and receivables or the entirety of the video game business, because it is uncertain how the value and cost of these items would be calculated. Finally, Defendants contend that the equity purchase agreement was indefinite because it lacked terms including the price of the stock, the value of the company on which the buy-in would be based, the amount of stock he could purchase, the form the stock could take, and any other terms of the buy-sell agreement.

Alexander disagrees with Defendants' assertions. Alexander testified that the commission agreement expressly defined how gross profit would be calculated, what expenses

would be deducted from commission, and which sales would generate commission. (Layden Decl. Ex. 2 at 63-64, 66-67.) And, the evidence indicates that Alexander actually received commissions from COKeM in accord with this agreement after he began providing services. Alexander further disputes that he claimed that he was entitled to the entire video game business, and he further testified that they agreed that the price for inventories would be at cost, and the price of the receivables would be the value on the day that Alexander made the purchase. Finally, Alexander simply claims that whether additional terms of the equity purchase agreement were discussed or essential presents an issue for the jury. He does assert that he and Bond agreed that COKeM's value would be determined by an appraisal, but that the details of such appraisal would be dealt with as necessary. He also testified that they agreed to a forty percent equity purchase of COKeM stock.

Viewing the evidence in the light most favorable to Alexander, the Court cannot say at this time that the July 2000 agreements are indefinite or vague as a matter of law. The Court finds that it remains an issue for the jury whether the terms were even discussed, what terms were essential to the contract, and exactly what, if anything, constituted the agreements. See Bergstedt, Wahlberg, Berquist Assoc., Inc. v. Rothchild, 225 N.W.2d 261, 263 (Minn. 1975) ("the existence of a contract, but also the terms and construction of that contract are questions of fact to be determined by the factfinder"). Thus, Alexander has established a genuine issue of material fact regarding both what was actually discussed between the parties as well as the essential terms of the July 2000 agreements. If and when a jury evaluates the intent of the parties and determines the terms of the agreement, then the legal determination as to

definiteness may be made. See Hartung v. Billmeier, 66 N.W. 2d 784, 787-88 (Minn. 1954) ("Although vagueness and indefiniteness may prevent the creation of a contract, it is not to be forgotten that any offer or agreement is indefinite and uncertain in some degree since words are but imperfect symbols of what each party understands and intends.") Accordingly, viewing the facts in the light most favorable to Alexander as the Court must do, summary judgment is inappropriate.

### 3. Severability of the Agreement

Even if any part of the July 2000 agreements is unenforceable, there are issues of fact to preclude summary judgment. The relevant issue is whether the three parts of the July 2000 agreements are severable from each other. "If part of an agreement is unenforceable, a court may enforce the rest of the agreement in favor of a party who did not engage in serious misconduct if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange." Guercio v. Prod. Automation Corp., 664 N.W.2d 379, 385 (Minn. Ct. App. 2003) (citing Restatement (Second) of Contracts § 184(1)). Minnesota law requires that the intent of the parties must be ascertained to determine whether contract provisions are severable. See id. Other courts have determined that if the section of the contract was so central to the agreement that the parties would not have agreed absent that provision, then the unenforceable section is not severable. See id. (citing Hargrave v. Canadian Valley Elec. Coop., Inc., 792 P.2d 50, 60 (Okla. 1990)). If the unenforceable clause is not essential to the agreement, then the "offending provision will be excised and the remaining portions of the contract will be enforced." See id.

There is simply an issue of fact regarding the intent of the parties on the issue of severability. Despite the absence of an express written contract, COKeM paid Alexander commissions in accord with the terms of the July 2000 agreements. However, the purported lack of performance regarding the remaining portions of the July 2000 agreements indicates that COKeM intended the three portions of the agreement to be severable. In addition, Alexander's continued sales performance despite COKeM's alleged failure to fulfill all of its purported obligations of the July 2000 agreements also suggest severability. Conversely, Alexander's persistent refusal to agree to new contract terms after July 2000 predominantly based on the terms of the equity sale arguably demonstrate non-severability. Thus, the Court finds that issues of fact remain sufficient to withstand summary judgment.

    4.    Statute of Frauds

Defendants finally claim that the statute of frauds renders the July 2000 agreements unenforceable. Defendants contend that the agreements could not be performed within one year. They further argue that the agreement to sell inventories and receivables, which involves the purchase of goods and the assignment of real estate interests, violates the statute of frauds.

Alexander correctly points out that the test in Minnesota is not whether performance within one year is likely, but whether it is possible. Bannitz v. Hardware Mut. Cas. Co. of Stevens Point, Wis., 17 N.W.2d 372, 374 (Minn. 1975). Indeed, the July 2000 agreements could have been performed within one year. Moreover, Alexander has presented sufficient evidence to create an issue of fact on whether he performed as required under the July 2000 agreements. Further, because the Court finds that a genuine issue of material fact remains on

Alexander's fraud claim, an issue of fact therefore remains on whether Defendants may even assert a statute of frauds defense. See Sacred Heart Farmers Coop. Elevator v. Johnson, 232 N.W.2d 921, 923 (Minn. 1975) (equitable estoppel "may in a proper case serve to take a contract out of the statute of frauds"). Thus, the Court finds summary judgment is inappropriate.

### 5. Conclusion

Alexander has demonstrated that issues of fact regarding the enforceability of the July 2000 agreements remain for the jury. Accordingly, Defendants' Motion must be denied.

### C. Breach of Contract to Pay Commission

Defendants dispute that Alexander can sustain a breach of contract claim for unpaid commission because Alexander was an at-will employee. However, Alexander plainly disputes that he was an at-will employee and rather contends that he was Bond's partner. Indeed, the scope of the negotiations and subsequent documents suggest that Alexander was a partner. Even so, Defendants contend that Alexander consented to the continuous breach and therefore he may not raise this claim now. Following the change in his commission rates in July 2001, Alexander continued to work with COKeM and nevertheless accepted payment of commissions at the lower percentage rates. However, this alone does not establish accord and satisfaction sufficient to estop Alexander from pursuing commissions owed under the purported agreement. See Dwyer v. Ill. Oil Co., 252 N.W. 837, 839 (Minn. 1934) (valid accord and satisfaction required). Rather, COKeM would have had to inform Alexander that it intended the lesser commission to be full payment, and Alexander accordingly would have had to agree.

11

See id. There is no evidence that this intention was communicated to Alexander or that he otherwise agreed to it.

Finally, Defendants assert that if this claim survives, Alexander is limited to recovery of commissions from March 17, 2002 to June 28, 2002, by virtue of the statute of limitations. However, the statute of limitations pertains to master-servant employment relationships, which Alexander vehemently disputes existed between the parties. Thus, in sum, there are disputes of fact on this claim sufficient to preclude summary judgment.

**D.   Fraud**

Alexander claims that Bond and COKeM defrauded him by entering into the July 2000 agreements without any intent to perform. Misrepresentation of a present intention can amount to fraud. See Vandeputte v. Soderholm, 216 N.W.2d 144, 147 (Minn. 1974). However, Alexander must prove that Defendants had no intention to perform at the time the promise was made. See id.

Alexander submits that Defendants had no intention of performing. He contends that Bond's refusal to memorialize the July 2000 agreements but constant assurance that they would be memorialized evidence Bond's intent to refuse to perform. He further argues that because Bond knew that the purchase of equity required COKeM Board approval and that the sale of inventory required bank approval indicates that Defendants never intended to perform under the July 2000 agreements. At the very least, Alexander asserts that an issue of fact remains for the jury with respect to Defendants' present intention at the time of the July 2000 agreements. Thus, Alexander has established that a genuine issue of fact remains on his fraud

12

claim, and therefore summary judgment is inappropriate.

**CONCLUSION**

Alexander demonstrates that genuine issues of material fact remain for trial on all of his claims. Accordingly, based on all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Clerk Doc. No. 116) is **DENIED**.

Dated: September 29, 2005

s/ Paul A. Magnuson
Paul A. Magnuson
United States District Court Judge